## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | | |
|---|---|---|
| IMMUDYNE PR, LLC, also d/b/a Inate Scientific | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO.: _____ |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN DOES 1 through 20 (fictitious) | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Immudyne PR, LLC ("Immudyne") brings this Complaint against John Does 1 through 20 ("Does"), whose identities are presently unknown but who currently work or have worked on behalf of non-party Clickbooth.com, LLC ("Clickbooth"). Immudyne is a web-based business that sells health and beauty products. Clickbooth is an affiliate advertising network. Clickbooth and the Does systematically defrauded Immudyne and thousands of consumers through deceptive advertising. These tactics include an email and online survey hoax.

Immudyne contracted with Clickbooth to provide legal and truthful advertising so that consumers would visit Immudyne's website and purchase Immudyne's products. Acting on Clickbooth's behalf, the Does instead sent emails to thousands of unsuspecting consumers by which the Does fraudulently posed as Amazon, Costco, and other major household brands. The emails fraudulently represented that a consumer would win a free gift card by taking a brief online survey. After the consumer clicked a link in the email and completed the survey, the consumer was then directed to Immudyne's website. There, the consumer purchased Immudyne's products thinking they would also receive the free gift card. Weeks later, when the gift cards never arrived, thousands of furious consumers blamed Immudyne.

Immudyne learned about the fraudulent scheme from these consumers. It was perpetrated so Clickbooth and the Does could recover commissions from Immudyne to which they were not entitled. Clickbooth and the Does deceived thousands of consumers, defrauded Immudyne into paying over $500,000 in unearned commissions, and caused Immudyne to suffer at least $1,000,000 more in damages and irreparable harm arising from consumer complaints, refunds, and chargebacks, effectively destroying Immudyne's brand. Despite repeated demands by Immudyne and despite Clickbooth claiming that responsibility for the fraudulent scheme rests with the Does, Clickbooth has refused to disclose the identities of the Does.

## THE PARTIES

1. Plaintiff Immudyne is an online advertiser and limited liability company with its principal place of business at 53 Calle Palmeras, Suite 802, San Juan, Puerto Rico 00901.

2. Non-party Clickbooth is an affiliate network and limited liability company with its principal place of business at 5901 N. Honore Ave., Suite 210, Sarasota, FL 34243. Although Clickbooth shares liability with the Does for the acts and omissions described herein, Immudyne is not suing Clickbooth in this action. Clickbooth and Immudyne are parties to a contract which has an ambiguous arbitration provision, and Clickbooth has indicated it does not consent to be sued in this Court. Rather than engage in motions practice over enforceability of the arbitration provision, Immudyne anticipates a parallel arbitration against Clickbooth.

3. Defendant Does 1 – 20 have each worked on behalf of Clickbooth, are presently unknown to Immudyne or known by Immudyne only by their Clickbooth publisher number, and include John Doe 1 (Publisher #269); John Doe 2 (Publisher #355); John Doe 3 (Publisher #378); John Doe 4 (Publisher #8215); John Doe 5 (Publisher #2910); John Doe 6 (Publisher

2

#7326); John Doe 7 (Publisher #9612); John Doe 8 (Publisher #10942); and John Doe 9 (Publisher #11915).

## JURISDICTION AND VENUE

4.     This action arises under the Lanham Act, Title 15, Sections 1114 and 1125(a) and the laws of the State of Florida, including the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Section 501.201, et. seq., and Florida common law.

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. Sections 1331 and 1367(a) because this action involves one or more claims that arise under the laws of the United States and the state law claims are so related to the federal claims that they form part of the same case or controversy.  On information and belief, this Court also has subject matter jurisdiction pursuant to 28 U.S.C. Section 1332(a)(1) because this action is between persons of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.     This Court has specific personal jurisdiction over each Doe defendant because this action arises out of each Doe's extensive contacts with and within Florida, including by each Doe's activities working with Clickbooth in Florida and entering into a contract with Clickbooth which is governed by Florida choice of law and Sarasota, Florida venue provisions.

7.     This Court is a proper venue for this action pursuant to 28 U.S.C. Section 1391(b) and (c) because the Does regularly conduct business in this judicial district.

## CLICKBOOTH'S ASSURANCES ABOUT COMPLIANCE

8.     A web-based business needs potential customers to go to and make purchases on its website.  To that end, many web-based businesses, like Immudyne, work with and pay commissions to companies known as "affiliate networks" who together with their "affiliates" advertise the business, cause potential customers to click on a link in the advertising and go to

the web-based business website, and who thus help to drive traffic and potential customers to the website.  The practice of an affiliate network using truthful advertising to induce consumers to visit a web-based business is known in the online advertising industry as sending "quality traffic."  Clickbooth is an affiliate network that purports to provide these services to web-based businesses.

9.      At all times relevant herein, Clickbooth has represented to web-based businesses that Clickbooth and the Does provide advertising services in strict compliance with the law and best advertising practices.  These representations have been material to responsible web-based businesses, like Immudyne, who want to ensure that all advertising is truthful and consumers are not deceived.  For affiliate networks like Clickbooth and affiliates like the Does, there can be an incentive to "push the envelope" and make deceptive advertising claims because this can lead to higher commissions.  For web-based businesses, however, deceptive advertising can lead to furious consumers, high refunds and chargeback rates, loss of goodwill, and regulatory enforcement action.  To induce web-based businesses to contract with it and thereby hire Clickbooth and the Does, Clickbooth assured Immudyne and other web-based businesses that Clickbooth and the Does only engage in truthful and not deceptive advertising.

10.     Clickbooth provided these assurances to Immudyne in its marketing materials and communications.  Mr. Lee Aho, Clickbooth's Executive Vice President of Advertising, wrote to Immudyne and described Clickbooth as "the leading traffic provider in the trial/continuity space" emphasizing "we look for partners who understand the importance of providing a quality consumer experience."  In his Skype chats with Immudyne, Mr. Aho reinforced that Clickbooth would provide quality traffic, stating "the name of the game at the end of the day will be quality of traffic."

11.     On its website, www.clickbooth.com, Clickbooth likewise declares itself to be "THE #1 PERFORMANCE EXCHANGE IN THE WORLD" and states "PROGRAMMATIC PERFORMANCE RESULTING IN ZERO RISK AND HIGHER RETURNS," along with "WE DEMAND QUALITY."   See Clickbooth Website Screenshots, attached as Exhibit 1. Clickbooth further identifies itself as "The Brand You Can Count On," and "The Brand You Can Trust." Id.  As evidenced by Clickbooth and the Does' fraudulent scheme to defraud Immudyne and thousands of consumers, Clickbooth was not the "brand you can count on" or "trust."

12.     As shown below, Clickbooth represented to Immudyne and other web-based businesses that "Clickbooth is and always has been at the forefront of regulatory compliance and best practices" and "[o]ur Consumers [sic] Advocates ensure our ads, products and services are compliant with all marketing related requirements and regulations."



We know a brand's reputation is everything, and that's why we're the first traffic provider to develop our own strict compliance guidelines. Clickbooth is and always has been at the forefront of regulatory compliance and best practices, consistently ahead of other networks ensuring that we protect our clients and consumers alike. In a period of regulatory transition, our company-wide approach to consumer protection coupled with an industry leading compliance team is crucial to our client's success.

Our full-fledged, in-house compliance team includes Consumer Advocates and Brand Protection Specialists. Our Consumers Advocates ensure our ads, products and services are compliant with all marketing related requirements and regulations.

Our Brand Protection Specialists use industry leading methods to maintain the image, integrity and intellectual property of advertisers.

As the industry leading Performance Exchange we do not take our position lightly. We know that by holding ourselves accountable we protect Consumers, Advertisers, Affiliates and our industry as a whole. For us, compliance is not a requirement or an afterthought. It's the core of the way we do business.

Id.  As evidenced by Clickbooth and the Does' fraudulent scheme to defraud Immudyne and thousands of consumers, Clickbooth was not at the "forefront of regulatory compliance" and did not "ensure" that its "ads, products and services are compliant with all marketing related requirements and regulations."  Its representations to Immudyne and the public were false.

13.    As shown below, Clickbooth further represented to Immudyne and other web-based businesses that all of its affiliates, including the Does, have been thoroughly and carefully vetted before being able to work on Clickbooth's behalf and thereafter closely monitored via "CONTINUOUS QUALITY FILTERS" leading to "Results | Top Affiliates Providing Only High Quality Traffic."



Id.  As evidenced by Clickbooth and the Does' fraudulent scheme to defraud Immudyne and thousands of consumers, Clickbooth did not focus on "proactive and ongoing monitoring of [its] affiliates and their traffic" to ensure the "highest quality traffic."  Its representations to Immudyne and the public were false.

14.    As shown below, in its assurances to Immudyne and other web-based businesses, Clickbooth has reinforced this message yet again, describing "[o]ur fanatical stance on proactive compliance ensures that we protect the image, integrity and intellectual property of our Advertisers."



Id.  As evidenced by Clickbooth and the Does' fraudulent scheme to defraud Immudyne and thousands of consumers, Clickbooth did not employ a "fanatical stance on proactive compliance"

and did not "protect the image, integrity, and intellectual property of [its] advertisers." Its representations to Immudyne and the public were false.

## CLICKBOOTH'S AND THE DOES' FRAUDULENT SCHEME

15. Immudyne owns and operates the website www.inatescientific.com. There, Immudyne provides information about and sells popular health and beauty products branded under the I'nate Scientific name. These include I'nate Regenerating Eye Gel, I'nate Rejuvenating Ageless Serum, and I'nate Rejuvenating Skin Moisturizer.

16. In reliance on Clickbooth's representations, on March 21, 2016, Immudyne executed the Clickbooth.com Advertiser Terms & Conditions ("the Agreement"). See Agreement, attached as Exhibit 2. Clickbooth agreed on behalf of itself and its affiliates, including the Does, that Clickbooth would authorize its affiliates to "post ads on or through websites, newsletters, and/or applications they control." Id., ¶ 2. In exchange, Immudyne agreed to pay Clickbooth for each consumer that visited www.inatescientific.com via a Clickbooth advertisement and then completed a payable action (i.e., purchased an Immudyne product). Id., ¶¶ 4, 5. The Agreement further identified that Clickbooth was obligated to comply with a "Stipulated Final Judgment and Order for Permanent Injunction" entered on November 29, 2012 with the Federal Trade Commission ("FTC Order"), as well as with an "Assurance of Voluntary Compliance" entered on November 16, 2012 with the Florida Office of the Attorney General ("Florida Order"). Id., ¶ 15.

17. In the months following execution of the Agreement, Clickbooth and the Does created their own advertising, purported to advertise Immudyne products, and caused consumers to click on links in that advertising and then be directed to www.inatescientific.com. Immudyne paid a commission to Clickbooth when those consumers completed a payable action, and

8

Clickbooth thereafter paid a percentage of the commission to the affiliate responsible for the advertising. A Clickbooth affiliate tracking number was assigned to each of the Clickbooth affiliates who were part of the Immudyne advertising campaign. Does 1 – 9 who served as Clickbooth affiliates were and remain known to Immudyne only by a tracking number. These are John Doe 1 (Publisher #269); John Doe 2 (Publisher #355); John Doe 3 (Publisher #378); John Doe 4 (Publisher #8215); John Doe 5 (Publisher #2910); John Doe 6 (Publisher #7326); John Doe 7 (Publisher #9612); John Doe 8 (Publisher #10942); and John Doe 9 (Publisher #11915). Does 10 – 20 are those persons who otherwise assisted Does 1 – 9 or Clickbooth.

18.     Clickbooth never alerted Immudyne to any improper activity by the Does. Rather, by their words and actions until Immudyne discovered the fraudulent scheme, Clickbooth and the Does communicated that all advertising complied with Clickbooth's past representations, all legal and regulatory requirements, ethical and truthful advertising practices, and their obligations under the Agreement, including their obligations under the FTC Order and Florida Order. Immudyne felt comfort that its strong brand and positive goodwill were protected given that Clickbooth employed "AGGRESSIVE AFFILIATE REVIEW PROCESS," "ADVANCED FRAUD CONTROLS," and "ROUND THE CLOCK MONITORING."

19.     Between April 14 and October 2, 2016, Immudyne received Clickbooth invoices for payment and paid Clickbooth and the Does $555,570 believing that Clickbooth and the Does were reputable, compliant with the law, and not fraudsters. Clickbooth and the Does, however, were engaged in a massive fraudulent scheme that they concealed from Immudyne. By late-September and early-October 2016, Immudyne was alarmed to realize it was experiencing increasingly high chargeback rates, high return and refund rates, Better Business Bureau ("BBB") complaints, and other consumer complaints – received directly by Immudyne's

customer service department or otherwise posted online.  By investigating these complaints and tracking how complaining consumers had arrived at www.inatescientific.com, Immudyne then discovered what Clickbooth and the Does had been doing.

20.    For several months, with Clickbooth either authorizing the fraud or at least breaching its past assurances to Immudyne and violating its obligations to Immudyne under the Agreement and FTC Order, Clickbooth and the Does sent tens of thousands of deceptive emails to unsuspecting consumers – thousands of whom were then directed to www.inatescientific.com and purchased Immudyne's products.   In these emails for the benefit of Clickbooth and themselves, the Does falsely purported to be communicating as or on behalf of major household brands, such as Amazon, Netflix, Chase Bank, Costco, Wells Fargo, Time Warner, and Kohl's, and requesting that consumers take an online survey in exchange for a free gift card.   An example of such an email is shown below.

-----Original Message-----
From: Orders <orderalerts@resourcecomplexity.com>
To: scoot0922 <scoot0922@aol.com>
Sent: Fri, Aug 19, 2016 9:06 pm
Subject: RE: Your Amazon Order

**Thank you for your purchase!**

**You have been selected to receive a $50 Amazon gift card for answering the very brief survey/questions in the link below:**

**COMPLETE AMAZON SURVEY HERE >**

Not realizing that the emails were not authorized or sent by the identified household brand, thousands of consumers then clicked on a link in the email, completed a bogus survey, and then arrived at www.inatescientific.com.  Believing that the purchase of Immudyne products was the next step toward receiving the free gift card, thousands of consumers then submitted their credit card and address information, purchased Immudyne products, and expected to soon receive

delivery of the purchased Immudyne products as well as the free gift card.  The fraudulent scheme – deceptive emails, a bogus survey, and a promised free gift card from a major household brand – served to confuse and deceive consumers about the billing terms clearly and conspicuously disclosed on the www.inatescientific.com check-out page.

21.    This type of advertising is known in the industry as "incentivized traffic," is generally prohibited by responsible web-based businesses, and was prohibited by the terms of the Agreement.   Immudyne had no idea that Clickbooth and the Does were engaged in this fraudulent scheme or using incentivized traffic.  The Immudyne consumers received Immudyne products but did not receive any free gift cards because everything about the emails, the online survey, and the free gift cards was a hoax perpetrated by the Does to defraud consumers and Immudyne while enriching Clickbooth and the Does.  With thousands of Immudyne consumers waiting and ultimately realizing the free gift card would never arrive, these thousands of Immudyne consumers then complained, submitted chargebacks, and demanded refunds, which Immudyne readily provided.

22.    Again and again, these consumers explained that they had received an email from a major household brand, were promised a free gift card in exchange for taking an online survey, and then arrived at www.inatescientific.com and purchased Immudyne products only to never receive the free gift card.   Immudyne's customer service department received and recorded hundreds of complaints, including the examples below.

| Cust. ID | Notes | Date | Network | ID |
|---|---|---|---|---|
| 76530 | Cci inquiring charges. Took survey from Amazon(?).  Our products was one of 3 to choose from for free. Explained T&C. Cx still withing 30dt. Refunded processed to avoid dispute. Cx agreed to return product. Cx provided phone number in case sup. wants to talk to her. | 7/16/16 13:49 | Clickbooth | 378 |

| 77218 | cci, inquired the charges, took a survey in costco and was never mentioned regarding tC, was offered a free gift which was told were free samples, explained TC, offered 50% customer accepted. | 7/21/16 16:33 | Clickbooth | 378 |
|---|---|---|---|---|
| 78160 | cci to inquire about our terms and conditions, customer was offered our products through Kolh&#39;s as a free product if they answered a survey. offered disc, customer declined, issued corresponding RMA and return address. | 7/22/16 12:40 | Clickbooth | 269 |
| 80316 | cci to cancel account and request for a refund, customer heard about our product through a survey offer for free products on cox.net, explained terms and conditions, offered disc, customer cannot afford product, customer is still within the 30 day money back guaranteed, issued corresponding RMA, account fully closed. | 7/28/16 12:46 | Clickbooth | 269 |
| 89729 | Customer received email with subject saying amazon. Filled out a survey for a $50 gift card, which he did not receive, and instead got a free gift, one of them being our products. | 8/29/16 12:10 | Clickbooth | 378 |
| 90131 | cci to cancel account, very upset by being mislead filling an online survey for amazon and then get charged, explained to customer our T&C, issued corresponding refund as customer is within her 30 day moey back guaranteed. Account fully closed. | 9/2/16 19:01 | Clickbooth | 378 |
| 100042 | cci to cancel account, customer stated she got an email from Costco offering a $50.00 gift certificate or select a product from a group of merchant products to select from, she selected our product, explained T&C, offered customer to stay with the product for $29.99 so that she does not have to return product back to us, account fully closed. | 9/8/16 10:07 | Clickbooth | 269 |
| 106883 | cci, inq charges, took a survey from amazon, claimed the entire time was offered a free gift, explained TC, declined offer of 75%, wanted refund immediately, gave RMA, informed that needed to return product, felt mislead, schedule a call back from a supervisor. | 9/24/16 10:15 | Clickbooth | 8215 |
| 102937 | CCI to cancel. Claims product was a free gift from amazon. Cx keept the product for 20.00 safe sale. Refund of 78.95 given. Account cancelled. | 9/14/16 13:32 | Clickbooth | 8215 |

23.     Through this fraudulent scheme, Clickbooth and the Does falsely represented themselves to consumers and falsely promised free gift cards to consumers.   Through this fraudulent scheme, Clickbooth and the Does also falsely represented to Immudyne that Clickbooth and the Does had actually advertised and legally advertised Immudyne products to generate traffic to www.inatescientific.com and were not using incentivized traffic when in fact Clickbooth and the Does had instead falsely promised a free gift card and falsely advertised and pretended to be communicating on behalf of major household brands, e.g., Amazon.   Further, with at least forty-four transactions, Does 3 and 5 used a loop-hole tactic to manipulate the www.inatescientific.com landing page and pass through discounted coupons to the consumer so that Immudyne received no payment for shipping and handling its product.

24.     By its acts and omissions in directing and monitoring the Does, Clickbooth authorized this fraudulent scheme against consumers and Immudyne to generate and receive unearned commissions.   Immudyne has information about the commissions generated by each of Does 1 – 9 for the benefit of Clickbooth and themselves.

- Doe 1 (Publisher #269) was responsible for 4,243 transactions between April 4 to October 2, 2016 and thereby defrauded Immudyne into paying Clickbooth $190,980.

- Doe 2 (Publisher #355) was responsible for 61 transactions between July 8 to July 20, 2016 and thereby defrauded Immudyne into paying Clickbooth $2,745.

- Doe 3 (Publisher #378) was responsible for 1,485 transactions between June 28 to August 25, 2016 and thereby defrauded Immudyne into paying Clickbooth $66,825.

- Doe 4 (Publisher #8215) was responsible for 1,996 transactions between June 29 to October 3, 2016 and thereby defrauded Immudyne into paying Clickbooth $89,820.

- Doe 5 (Publisher #2910) was responsible for 1,074 transactions between April 14 to September 4, 2016 and thereby defrauded Immudyne into paying Clickbooth $48,330.

- Doe 6 (Publisher #7326) was responsible for 353 transactions between July 21 to September 26, 2016 and thereby defrauded Immudyne into paying Clickbooth $15,885.

- Doe 7 (Publisher #9612) was responsible for 87 transactions between July 11 to July 19, 2016 and thereby defrauded Immudyne into paying Clickbooth $3,915.

- Doe 8 (Publisher #10942) was responsible for 716 transactions between August 12 to September 19, 2016 and thereby defrauded Immudyne into paying Clickbooth $32,220.

- Doe 9 (Publisher #11915) was responsible for 239 transactions between September 7 to September 30, 2016 and thereby defrauded Immudyne into paying Clickbooth $10,755.

Clickbooth and the Does received these commissions by perpetrating a fraud at odds with Clickbooth's guarantees about an "AGGRESSIVE AFFILIATE REVIEW PROCESS," "ADVANCED FRAUD CONTROLS," and "ROUND THE CLOCK MONITORING" and in brazen violation of legal and regulatory requirements and their obligations under the Agreement, including their obligations under the FTC Order and Florida Order.

## CLICKBOOTH'S EFFORTS TO PROTECT THE DOES

25.     On October 7, 2016, Immudyne sent Clickbooth a demand letter detailing the extensive evidence of fraud and requesting that Clickbooth refund commissions and take corrective action. See Exhibit 3. Because Immudyne wanted to ensure that the Clickbooth affiliates did not continue to defraud through another affiliate network, Immudyne also requested that Clickbooth disclose the name and contact information for the Does. Id. Immudyne added "[t]o the extent that Clickbooth wants to continue its relationship with Immudyne PR, we further demand the Clickbooth provide us with a meaningful plan that describes how you will supervise affiliates and ensure compliance with all applicable U.S. federal and state law, as well [as] FTC Guidelines regulating the advertising of products on the Internet." Id. Clickbooth provided no refund, provided no information, and offered no corrective action. Instead, by letter dated

October 17, 2016, Clickbooth denied any liability and instead placed blame on the Does or on Immudyne for not having discovered any fraud sooner.  See Exhibit 4.

26.     Immudyne contracted with Clickbooth because of its assurances about legal compliance.  Yet, in its October 17, 2016 letter, Clickbooth ignored its prior assurances like Clickbooth "is and has always been at the forefront of regulatory compliance and best practices," has an "industry leading compliance team," ensures "ads, products and services are compliant with all marketing related requirements and regulations," and has a "fanatical stance on proactive compliance."  See Exhibit 1.  Instead, the affiliate network that bills itself as "LEADERS IN COMPLIANCE" asserted that "Clickbooth does not represent or warrant that the Ads, or such policies, specifications and/or recommendations associated with the Ads, are legally compliant or otherwise."  See Exhibit 4.

27.     Immudyne contracted with Clickbooth because of its assurances about thoroughly vetting and choosing to work with only the most responsible affiliates.  Yet, in its October 17, 2016 letter, Clickbooth ignored its prior assurances like "WE FOCUS ON PROACTIVE AND ONGOING MONITORING OF AFFILIATES AND THEIR TRAFFIC," "CONTINUOUS QUALITY FILTERS" and "Results I Top Affiliates Providing Only High Quality Traffic" and likewise ignored that Clickbooth and its affiliates had created the advertising and emails that were used.  See Exhibit 1.  Instead, Clickbooth characterized itself as a middle-man that simply connected Immudyne to independent contractors, stating "Clickbooth serves as a Performance Exchange for Advertisers and Affiliates and, as such, 'Clickbooth's exclusive obligation is to distribute advertising campaigns … consisting of advertisements provided by Immudyne."

28.     Immudyne contracted with Clickbooth because of its assurances about placing a premium on integrity and accountability in protecting advertisers and their brand.  Yet, in its

October 17, 2016 letter, Clickbooth ignored its prior assurances like "[w]e know a brand's reputation is everything," we "use industry leading methods to maintain the image, integrity and intellectual property of advertisers," and "by holding ourselves accountable we protect Consumers, Advertisers, Affiliates and our industry as a whole." See Exhibit 1.  Instead, Clickbooth asserted that "Immudyne has make [sic] weak claims of fraud and other misconduct on the part of Clickbooth affiliates" and that it is Immudyne's fault that it did not discover any fraud sooner and contest Clickbooth's invoices within seven (7) days of receipt.  See Exhibit 4.

29.    By letter dated October 21, 2016, Immudyne responded to Clickbooth and put Clickbooth on notice of the substantial likelihood of litigation.  See Exhibit 5.  Immudyne requested that Clickbooth preserve and provide all advertising and emails used by Clickbooth and the Does to generate the commissions.  Id.  Immudyne again requested that "Clickbooth now disclose the identity, location, and other contact information for the Clickbooth Publishers [the Does]," adding that "[i]f not yet done, Clickbooth should also report those Clickbooth Publishers involved in the deceptive and fraudulent advertising to law enforcement." Id.  To date, Clickbooth has refused to provide any advertising and emails used by Clickbooth and the Does to generate the commissions.  Clickbooth has likewise refused to disclose the identity, location and contact information for the Does.  On information and belief, Clickbooth has not reported itself or the Does to the Florida Office of Attorney General or the FTC.

30.    The FTC Order against Clickbooth was entered on November 18, 2012 by the U.S. District Court for the Northern District of Illinois Eastern Division.  See Exhibit 6.  It arose from the FTC's charge that the Defendants, Clickbooth, a related Florida company Integraclick, LLC, and their owner John Daniel Lemp, had committed deceptive acts or practices and false advertisements in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

16

Under the FTC Order, Clickbooth and its affiliates (including the Does) are "permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting any material fact, expressly or by implication." Id., Section I.A.  In addition to permanent injunctive relief, including extensive compliance monitoring, Defendants were ordered to pay $2,000,000.  Id., Section VII.A.  The FTC Order and the companion AVC with the Florida Office of Attorney General were intended to protect consumers like Immudyne and the thousands of others who received deceptive emails from Clickbooth and its affiliates.

31.     Clickbooth should not be protecting or acting in concert with the Does, especially in light of the FTC Order.  Pursuant to the FTC Order, Clickbooth is required to obtain and keep detailed information about all of its affiliates.  At Section I.C.1, the FTC Order states:

> [Defendants must] [r]equire each Affiliate and/or Affiliate Network used in any Affiliate Program to provide to Defendants the following identifying information: a. in the case of a natural person, the Affiliate's or Affiliate Network's first and last name, physical address, country, telephone number, email address, and complete bank account information as to where payments are to be made to that Person.

Thus, Clickbooth should have received and can readily produce records from each of the Does containing information about who they are, how and where they can be found, and what bank accounts have been used to receive Immudyne commissions.

32.     Pursuant to the FTC Order, Clickbooth is required to ensure that all of its affiliates, including the Does, receive the FTC Order and expressly agree to comply.  At Section I.C.2, the FTC Order states:

> As a condition of doing business with any Affiliate or Affiliate Network or such Affiliate or Affiliate Network's acceptance into any Defendant's Affiliate Program: [Defendants] must (a) provide each such Affiliate or Affiliate Network a copy of this Order; (b) obtain from each such Affiliate or Affiliate Network a signed and dated statement acknowledging receipt of this Order and expressly agreeing to comply with this Order; and (c) clearly and conspicuously disclose in writing that engaging in acts or practices prohibited by this Order will result in immediate termination of any Affiliate or Affiliate Network and forfeiture of all monies owed to such Affiliate or Affiliate Network.

Thus, Clickbooth should have received and can readily produce signed and dated statements from each of the Does, whereby each has expressly agreed to comply with the FTC Order.

33.     Importantly, the FTC Order also mandates that Clickbooth receive, review, and pre-approve any advertising by an affiliate before it can be publicly disseminated.  Thereafter, Clickbooth must monitor the affiliate to ensure that only approved advertising is disseminated. At Section I.C.3, the FTC Order states:

> [P]rior to the public use or dissemination to consumers of any marketing materials, including, but not limited to, websites, emails, and pop-ups used by any Affiliate or Affiliate Network to advertise, promote, market, offer for sale, or sell any goods or services through any Defendant's Affiliate Program, [Defendants must require that each affiliate provide and each affiliate must, in turn, provide to Defendants] (a) copies of marketing materials to be used by the Affiliate or Affiliate Network, including text, graphics, video, audio, and photographs; (b) each location the Affiliate or Affiliate Network maintains, or directly or indirectly controls, where the marketing materials will appear, including the URL of any website; and (c) for hyperlinks contained within the marketing materials, each location to which a consumer will be transferred by clicking on the hyperlink, including the URL of any website.  Defendants shall also require each Affiliate or Affiliate Network to maintain and provide to Defendants upon request records of the dates when the marketing materials are publically used or disseminated to consumers.

At Section I.C.4, the FTC Order further states:

> [Defendants must] [p]romptly review the marketing materials specified in Section I.C.3 above as necessary to ensure compliance with this Order.  Defendant shall also promptly take steps as necessary to ensure that the marketing materials provided to Defendants under Section I.C.3 above are the marketing materials publically used or disseminated to consumers by the Affiliate or Affiliate Network.  If a Defendant determines that use of any marketing materials does not comply with this Order, such Defendant shall inform the Affiliate or Affiliate Network in writing that approval to use such marketing materials is denied and shall not pay any amounts to the Affiliate or Affiliate Network for such marketing, including any payments for leads, "click-throughs," or sales resulting therefrom.

At Section I.C.5, the FTC Order adds:

> [Defendant must] promptly investigate any complaints that any Defendant receives through any source to determine whether any Affiliate or Affiliate Network is engaging

in acts or practices prohibited by this Order, either directly or through any Affiliate that is part of any Defendant's Affiliate Program.

Thus, the Does were required to provide all advertising, including the emails, to Clickbooth before any public dissemination for review and approval by Clickbooth. If Clickbooth did so and thus received, reviewed, and approved the deceptive emails, then Clickbooth approved the Does' actions in defrauding thousands of consumers and then Immudyne in violation of the FTC Order. If Clickbooth instead did not require the Does to submit all advertising to Clickbooth for approval, Clickbooth abdicated the monitoring obligations in place to protect consumers and advertisers like Immudyne, thereby allowed its affiliates to commit fraud, and thus still violated the FTC Order.

34. Based on the FTC Order, Clickbooth should have and can readily produce all of the advertising and emails received from the Does. Based on the FTC Order, Clickbooth should have and can readily produce records of its monitoring of the advertising and emails after dissemination as well as its investigation of the Does following complaints. If Clickbooth is "at the forefront of regulatory compliance and best practices," Clickbooth should be providing these records and should not be protecting the Does.

35. In this action, Immudyne will seek expedited non-party discovery of Clickbooth's records. Pursuant to Section XI of the FTC Order, Clickbooth is required to preserve and produce to the FTC on demand:

> (C) Records relating to Affiliates or Affiliate Networks including all names, addresses, and telephone numbers; dollar amounts paid or received; and information used in calculating such payments; (D) Complaints and refund requests, whether received directly or indirectly, such as through a third party, and any response; (E) All records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission; [and] (F) Copies of all marketing materials, documents, and information received pursuant to Subsection I.C.3 of this Order; and all written approvals or denials of marketing materials made pursuant to Subsection 1.C.4 of this Order.

Clickbooth was required to preserve its records to ensure the evidence would be available in a matter like this.  The discovery of Clickbooth's records is highly relevant toward ensuring that the Does are identified and held responsible for their fraud against thousands of consumers and Immudyne.

36.     Contrary to Clickbooth's assurances about compliance, Clickbooth and the Does did nothing to "protect the image, integrity, and intellectual property" of Immudyne.  Clickbooth and the Does have instead caused Immudyne extensive damage and irreparable harm.  Immudyne's out-of-pocket damages include its payment of approximately $500,000 in fraudulently obtained commissions, $215,000 in consumer refunds, $250,000 in chargebacks and chargeback fees, and $200,000 in product costs, fulfillment, delivery and merchant fees arising from the fraudulent Clickbooth transactions.  Clickbooth and the Does caused Immudyne to suffer termination of merchant accounts for high chargebacks and blacklisting by Amazon for high consumer complaints, causing at least $350,000 in lost profits.  Clickbooth and the Does further caused profound loss of goodwill and harm to Immudyne's reputation in the minds of consumers.  Clickbooth is responsible for all of this as are the Does that Clickbooth wants to blame but seeks to hide.

## COUNT I
### Violation of the Florida Deceptive and Unfair Trade Practices Act

37.     Immudyne restates and re-alleges paragraphs 1 – 36 above as if fully set forth herein.

38.     For the benefit of themselves and Clickbooth, the Does fraudulently purported to communicate as and on behalf of major corporations and household brands, including Amazon, Netflix, Chase Bank, Costco, Wells Fargo, Time Warner, and Kohl's.  Using a false identity, the

Does sent deceptive advertisements and emails to thousands of consumers, fraudulently offering consumers free gift cards in exchange for clicking a link and taking an online survey. The Does then fraudulently directed trusting consumers to www.inatescientific.com conveying the expectation that, with the purchase of an Immudyne product, they would receive a free gift card.

39.     The Does knew their activities were deceptive and unlawful, but neither Clickbooth nor the Does disclosed their fraudulent scheme to Immudyne or consumers. Rather, by directing consumers to www.inatescientific.com in connection with Clickbooth's advertising services, the Does fraudulently communicated to Immudyne that the Does were not using incentivized traffic and had actually advertised and had legally advertised Immudyne products. Through their fraudulent scheme and successful deception, the Does received unearned commissions, consumers did not receive free gift cards, and Immudyne suffered damages.

40.     By the acts and omissions set forth above, the Does committed unfair methods of competition and unfair and deceptive acts and practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes Chapter 501 et seq.

41.     By the acts and omissions set forth above, the Does have engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in commerce and in the conduct of their commercial endeavors.

42.     The Does' unfair methods of competition and unfair and deceptive acts and practices were undertaken with knowledge and intent to unlawfully confuse and injure consumers, including Immudyne, and advance the business interests of the Does at the expense of consumers.

43.     The Does' unfair methods of competition and unfair and deceptive acts and practices were willful, wanton, calculated to deceive, and undertaken in bad faith.

44.     The Does' unfair methods of competition and unfair and deceptive acts and practices did mislead and were likely to mislead consumers, including Immudyne, acting reasonably in the circumstances and to the detriment of consumers.

45.     The Does' unfair methods of competition and unfair and deceptive acts and practices offend established public policy, are immoral, and are unethical, oppressive, unscrupulous or substantially injurious to consumers.

46.     As a direct and proximate result of their violation of Florida Statutes Chapter 501 et seq., the Does caused Immudyne actual and out-of-pocket damages, lost profits, reputational harm and loss of goodwill in an amount exceeding $1,500,000.

<u>COUNT II</u>
**Common Law Fraud**

47.     Immudyne restates and re-alleges paragraphs 1 – 36 above as if fully set forth herein.

48.     By directing consumers to www.inatescientific.com in connection with Clickbooth's advertising services, the Does fraudulently communicated to Immudyne that the Does were not using incentivized traffic and had actually advertised and had legally advertised Immudyne products.

49.     By the acts and omissions set forth above, the Does knowingly made false statements of material fact with the intent to deceive and defraud Immudyne and to induce Immudyne to rely on their statements and thereby pay unearned and unwarranted commissions to Clickbooth and the Does.

50.     At the time these statements were made by the Does, Immudyne was ignorant of the falsity of the Does' statements and reasonably relied on the Does' statements, paying

Clickbooth and the Does based on the reasonable belief that the Does had actually advertised and legally advertised Immudyne products.

51.     At all times, the Does knew that they were deceiving Immudyne and acted with actual malice and the specific intent of deceiving Immudyne.

52.     As a direct and proximate result of the Does' fraud, Immudyne was induced to pay unearned commissions and suffered actual and out-of-pocket damages, lost profits, reputational harm and loss of goodwill in an amount exceeding $1,500,000.

53.     The Does' fraud was willful, wanton, calculated to deceive, and undertaken in bad faith, warranting an award of exemplary and punitive damages.

## COUNT III
### Unfair Competition Under § 1125(a) of The Lanham Act

54.     Immudyne restates and re-alleges paragraphs 1 – 36 as if fully set forth herein.

55.     By the acts and omissions set forth above, including by falsely associating Immudyne's goods, services, or commercial activities with those of unrelated major corporations and household brands, including Amazon, Netflix, Chase Bank, Costco, Wells Fargo, Time Warner, and Kohl's, the Does committed unfair competition in violation of the Lanham Act, 11 U.S.C. Section 1125(a)(1)(B).

56.     In connection with commercial advertising or promotion of goods or services, the Does used in commerce a word, term, name, symbol, or device of any combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact to misrepresent the nature, characteristics, qualities, or geographic origin of Immudyne's goods, services, or commercial activities.

Case 8:16-cv-03464-SDM-TBM   Document 1   Filed 12/21/16   Page 24 of 25 PageID 24

57.     The misrepresentations by the Does were material in that they influenced the purchasing decisions of thousands of customers who thought they would receive a free gift card from major retail brands.

58.     The misrepresentations by the Does were likely to deceive and actually did deceive consumers into believing they would receive a free gift card from major retail brands.

59.     The Does placed their false statements in interstate commerce by placing them online so that the false statements could be, and were, accessed by consumers across the United States, including in this jurisdiction.

60.     As a direct and proximate result of their violation of the Lanham Act, 11 U.S.C. Section 1125(a)(1)(B), the Does caused Immudyne actual and out-of-pocket damages, lost profits, reputational harm and loss of goodwill in an amount exceeding $1,500,000.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Immudyne PR, LLC respectfully requests that the Court provide the following relief:

(i)     judgment in favor of Immudyne and against the Does for violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes Chapter 501 et seq.;

(ii)    judgment in favor of Immudyne and against the Does for common law fraud;

(iii)   judgment in favor of Immudyne and against the Does for violation of the Lanham Act, 15 U.S.C. Section 1125;

(iv)    an award of actual, statutory, exemplary and punitive damages in an amount to be determined at trial;

(v)     permanent injunctive relief prohibiting the Does from participating in any campaign to advertise Immudyne and from seeking to generate commissions from Immudyne;

(vi)    a finding that the Does' conduct constitutes an exceptional case under 15 U.S.C. Section 1117(a);

(vii)   attorneys' fees, costs, and pre-judgment interest; and

(viii)   such other and further relief as this Court deems just and proper.

Plaintiff Immudyne PR, LLC demands trial by jury on all issues so triable.

Date: December 20, 2016                    Respectfully submitted,


/s/ Richard E. Doran
Richard E. Doran, Esq., Bar No. 0325104
Trial Counsel
Douglas L. Kilby, Esq., Bar No. 0073407
Ausley & McMullen, PA
123 South Calhoun Street
Tallahassee, Florida 32301
Telephone: (850) 224-9115
Facsimile: (850) 222-7560
rdoran@ausley.com
dkilby@ausley.com

Damon W.D. Wright, Esq.
Venable LLP
575 7th Street, NW
Washington, DC 20004
Telephone: (202) 344-4937
Facsimile (202) 344-8300
dwdwright@venable.com

*Attorneys for Plaintiff Immudyne PR, LLC*